IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:11-HC-2052-BO

| | |
|---|---|
| JAKIEM L. WILSON,<br>　　　　Petitioner,<br><br>　　v.<br><br>NCDOC,<br>　　　　Respondent. | )<br>)<br>)<br>)　　O R D E R<br>)<br>)<br>) |

Jakiem L. Wilson ("petitioner" or "Wilson"), a state prisoner, petitioned this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent has filed a motion for summary judgment [D.E. 14 -15]. Petitioner was notified of the filing [D.E. 16] and thereafter responded [D.E. 18]. The matter is now properly before the court for disposition.

On July 12 2008, in the Superior Court of Wake County, Wilson was found guilty following a capital trial by jury of first-degree murder. North Carolina v. Wilson, 203 N.C. App. 742, 693 S.E.2d 282, 2010 WL 1753379 (N.C. App. May 4, 2010) (unpublished); Pet., Question 1 -5. Following the sentencing proceeding and based upon the jury's recommendation, petitioner was sentenced to a term of life imprisonment without the possibility of parole. Id.; Pet., Question 3. Petitioner was represented at trial by Amos G. Tyndall and Hoyt G. Tessener. Pet., 16.

Petitioner noticed an appeal of right to the North Carolina Court of Appeals, and on May 4, 2010, that court found no error in petitioner's criminal judgment. Wilson, 2010 WL 1753379 at *1. Petitioner was represented on appeal by Mark Montgomery. Id., at *1.

On June 7, 2010, petitioner next filed, through Mark Montgomery, a petition for discretionary review in the Supreme Court of North Carolina, and on August 26, 2010, it was denied by that court. North Carolina v. Wilson, No. 239P10, 701 S.E.2d 679 (N.C. Aug. 26, 2010).

On December 28, 2010, petitioner filed a pro se motion for appropriate relief (MAR) in the Superior Court, Wake County. (Mem. in Supp. of Summ. J., Ex. 8; see Ex. 9 (noting date filed)). On February 7, 2011, the Superior Court denied petitioner's MAR because it was without merit; because petitioner showed no prejudice; and because the motion was barred by N.C.G.S. § 15A-1419. (Mem. in Supp. of Summ. J., Ex. 9).

On February 22, 2011, petitioner filed a pro se petition for writ of certiorari in the North Carolina Court of Appeals seeking review of the Superior Court's order denying his MAR. (Id., Ex. 10). On March 11, 2011, the North Carolina Court of Appeals denied petitioner's certiorari petition. (Id., Ex. 11). Petitioner submitted this habeas petition on March 15, 2011, which was filed on March 18, 2011.

## GROUNDS FOR RELIEF

Petitioner alleges the following: (1) the trial court constructively amended the indictment and allowed the jury to convict upon a theory not supported by the indictment in violation of the Fifth, Sixth, and Fourteenth Amendments; (2) trial counsel failed to do legal research or have adequate knowledge, so as to challenge the constitutionality of the charge of first-degree murder by lying in wait, and was therefore ineffective; (3) the trial court's charge to the jury of the crime of first-degree murder by lying in wait was prohibited by the Double Jeopardy Clause of the Fifth Amendment, and the court's failure to instruct the jury as to the existence of the "conclusive presumption" violated the Due Process Clause of the Fourteenth Amendment; (4) murder by laying in wait is second-degree murder because it does not require the State to prove the element of specific intent to kill, and therefore, the State is relieved of its burden of proving every element of the charged offense in violation of due process; (5) the trial court erred in denying

2

Petitioner's motion for the State to disclose the theory of first-degree murder it intended to rely upon and in submitting to the jury the theory of lying in wait; and that the trial court committed plain error in its instructions to the jury on lying in wait.

## STATEMENT OF FACTS

II. Evidence

At trial, the State's evidence tended to show the following: At 6:08 a.m. on 13 February 2007, Defendant called 911 to report that he had just found his wife Nneka Sutton Wilson ("Nneka") dead in his home. The 911 operator dispatched officers from the Wake County Sheriff's Department to Defendant's house.

Officer Lee Chamblee testified that when he arrived at Defendant's house, he found the victim lying nude on the kitchen floor. Chamblee observed writing in blood on the kitchen floor, the alarm clock in a bedroom was going off, and the shower in the master bedroom was running. It appeared that the back door to the kitchen had been forced open. Chamblee called his dispatcher to report that there had been a homicide.

Deputy Shawn Curtis, another officer dispatched to the scene, spoke with Defendant at the scene. Defendant told him that he had gone to Selma the night before and had stayed there overnight with his friend Jamie Holder ("Jamie"). When Defendant came home in the morning, he found Nneka dead in the kitchen. Curtis further testified that when Defendant's parents came to take care of Defendant's two children who were still in the house, Defendant said to them, "[T]hey killed her. They killed her."

Deputy Kenny Blackwell testified that he interrogated Defendant at the scene. Defendant told Blackwell that he had driven Jamie to Selma the night before. After the two started drinking, Defendant spent the night in Selma and drove home the following morning. When he got home around 6:00 a.m., he found his wife dead in the kitchen. Defendant stated to Blackwell that he thought the killing was gang-related. Defendant said that the killers were members of the Bloods gang and that Defendant was a member of the Folk gang. Defendant also told several other officers at the scene that he thought the killing was gang-related.

At trial, Jamie testified for the State. Jamie testified that he had spoken to Defendant on the telephone on the night of the murder. At that time, Defendant told Jamie that his wife was getting on his nerves and that he was thinking of stabbing her when she was getting out of the shower.

Jamie further testified that Defendant picked up Jamie and their friend Roderick Howell ("Roderick") on 12 February 2007 at around 10:56 p.m. and took them to his home to show them the murder scene. Defendant told them that he killed Nneka

because "[s]he nagged. She bitch too much. She want to put me on child support and I work too hard for my money." As Jamie and Roderick walked in the house, they saw the victim dead on the kitchen floor in a pool of blood.

Jamie testified that Defendant explained to them that he had killed his wife in the following manner: Nneka had just finished taking a shower and entered the bedroom she shared with Defendant wrapped in a towel. Defendant was lying on their bed with a knife concealed under his body. Defendant asked his wife for a kiss but she refused. Defendant got up and stabbed her in the chest. She was bleeding profusely and fell between the dresser and the wall. Defendant stabbed her again multiple times and tried to cut her throat. Defendant dragged his wife to the kitchen "to finish her off[.]"

Jamie testified that while he and Roderick were at the house with Defendant, Defendant soaked up the blood on the floor with rags and handed the rags to Jamie and Roderick. Defendant told them to "mess the place up" to make it look like someone had broken in and killed Nneka. Roderick went in the back room while Jamie wrote a message on the floor in the kitchen. Defendant stood over Jamie and told him to write, "[Y]our bitch dead, you're next, Fu[.]" Jamie and Roderick went into the master bedroom under Defendant's direction and pulled out the drawers.

Defendant cleaned up the area using Nneka's brush. Defendant told Jamie, "[D]ead bitch not going to need her brush." Defendant, Jamie, and Roderick took household items from Defendant's house and dumped them in some nearby woods to make it look like a burglary had taken place. Defendant took Roderick home. Then Defendant drove Jamie home to Selma and Defendant slept at Jamie's house for three or four hours. Defendant told Jamie that he was going to use him as an alibi.

Roderick also testified for the State at trial as follows: On 12 February 2007, Defendant called him five times. In the first call, Defendant told Roderick that he and his wife were arguing and that he needed Roderick to kill her. In the second call, Defendant said, "[I]t's done, it's done." During the third call, Defendant told Roderick, "[L]isten to this." Roderick could hear the victim gasping for breath. The fourth call was to alert Roderick that Defendant was on his way over to pick Roderick up. Defendant called a fifth time to tell Roderick to meet him at the nearby Poole's Garage. Roderick's testimony regarding what Defendant told him about how he murdered Nneka and what Roderick saw and did at Defendant's home after the murder was similar to Jamie's testimony.

John "Reco" Lee testified for the State. He testified that he was in a gang with Defendant, Jamie, and Roderick. Defendant was "above" Reco in the gang hierarchy. Defendant picked Reco up from jail on 10 February 2007 and the two went to Defendant's house. As Nneka was leaving the house, Defendant drew his hand across his throat, a sign Reco understood to mean that Defendant was going to kill his wife. Defendant then ordered Reco to kill Nneka. Reco told Defendant he would do it "as soon as possible" because he felt like "if I didn't say that, then he talking about killing

4

his wife, he definitely kill me or whatever." Reco left Defendant's house about 30 minutes later. Reco did not speak with Defendant on 12 February 2007 and heard about Nneka's death from a friend. Although he also received a collect phone call from Defendant in jail after the murder, Reco did not accept the call.

Chief Medical Examiner Dr. John Butts testified that Nneka died as a result of three stab wounds: one wound was to her jugular vein, one wound pierced her heart, and one wound pierced her lung. There were six to eight cuts under her neck as well. Nneka had multiple defensive wounds on her left hand, indicating that she had attempted to ward off Defendant's attack, but no defensive wounds on her right hand, indicating that she may have been holding something in her right hand when she was attacked. There were no wounds on her back.

Defendant did not testify at trial but called 12 witnesses who testified regarding Defendant's family life and upbringing, schooling, juvenile problems, recent employment, and psychiatric problems. In his opening statement, Defendant admitted that he had committed the acts that caused Nneka's death but denied premeditation and deliberation. In his closing argument, Defendant argued that he should be convicted of second-degree murder, not first-degree murder, for killing his wife.

Wilson, 2010 WL 1753379 at *1 -*3.

## DISCUSSION

A. Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

A federal court cannot grant habeas relief in cases where a state court considered a claim on its merits unless (1) the state-court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or (2) the state-court decision was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d). A state court decision is "contrary to" Supreme Court precedent if it either "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially

5

indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to the Supreme Court's result. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407; see Hardy v. Cross, ___U.S. ___, 132 S. Ct. 490, 493–94 (2011) (per curiam); Bobby v. Dixon, , ___U.S. ___, 132 S. Ct. 26, 29–31 (2011) (per curiam); Cavazos v. Smith, , ___U.S. ___, 132 S. Ct. 2, 4–8 (2011) (per curiam); Renico v. Lett, , ___U.S. ___, 130 S. Ct. 1855, 1862 (2010).

> [Section 2254(d)] does not require that a state court cite to federal law in order for a federal court to determine whether the state court decision is an objectively reasonable one, nor does it require a federal habeas court to offer an independent opinion as to whether it believes, based upon its own reading of the controlling Supreme Court precedents, that the [petitioner's] constitutional rights were violated during the state court proceedings.

Bell v. Jarvis, 236 F.3d 149, 160 (4th Cir. 2000) (en banc); see also, Harrington v. Richter, ___ U.S. ___, 131 S. Ct. 770, 784-85 (2011) (a state court need not cite or even be aware of the Supreme Court precedent, '[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.") Moreover, a state court's factual determination is presumed correct, unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Sharpe v. Bell, 593 F.3d 372, 378 (4th Cir. 2010).

B. <u>Grounds for Relief</u>

i. (Claims 1, 4, and 5): the trial court constructively amended the indictment and allowed the jury to convict upon a theory not supported by the indictment in violation of the Fifth, Sixth, and Fourteenth Amendments; murder by laying in wait is second-degree murder

6

because it does not require the State to prove the element of specific intent to kill, and therefore, the State is relieved of its burden of proving every element of the charged offense in violation of due process; and, the trial court erred in denying petitioner's motion for the State to disclose the theory of first-degree murder it intended to rely upon and in submitting to the jury the theory of lying in wait

Claims 1, 4, and 5 shall be considered together as they take issue with the use of North Carolina's short-form indictment to the charge of murder by lying in wait and with the State's alleged failure to notify petitioner of the theory of murder it intended to pursue at trial. The Court of Appeals held the following as to these issues.

C. Short-form Indictment

Defendant next argues that the trial court erred in denying Defendant's motion for the State to disclose the theory of first-degree murder on which it intended to rely at trial and in submitting to the jury the theory of lying in wait. Specifically, Defendant argues that the use of the short-form indictment, combined with the State's refusal to otherwise put Defendant on notice that he would have to defend himself against the theory of lying in wait for the victim, denied him of his state and federal constitutional rights to present a defense and to due process of law.

1. Use of the Short-form Indictment

The short-form indictment for homicide is authorized by N.C. Gen Stat. § 15-144. North Carolina v. Wallace, 351 N.C. 481, 504, 528 S.E.2d 326, 341, cert. denied, 531 U.S. 1018, 121 S. Ct. 581, 148 L.Ed.2d 498 (2000). The North Carolina Supreme Court has consistently held that indictments for murder based on the short-form indictment statute are in compliance with both the State and Federal Constitutions. Id. at 504-05, 528 S.E.2d 326, 528 S.E.2d at 341; see North Carolina v. Hunt, 357 N.C. 257, 258, 582 S.E.2d 593, 595 (the process of indictment by grand jury pursuant to N.C. Gen.Stat. § 15-144 adequately safeguards a defendant's rights under the Federal and North Carolina Constitutions), cert. denied, 539 U.S. 985, 124 S. Ct. 44 (2003). More specifically, our Supreme Court "has consistently held that murder indictments that comply with [N.C. Gen.Stat.] § 15-144 are sufficient to charge first-degree murder on the basis of any theory set forth in [N.C. Gen.Stat.] § 14-17." North Carolina v. Garcia, 358 N.C. 382, 388, 597 S.E.2d 724, 731 (2004), cert. denied, 543 U.S. 1156, 125 S. Ct. 1301 (2005).

7

> Defendant acknowledges that "as a matter of current state law, the short [-] form indictment ... [is] proper," but nonetheless urges this Court to consider the matter anew. This we cannot do. We are bound by the precedent set by the North Carolina Supreme Court, and, thus, we conclude that the short-form indictment in this case did not violate Defendant's constitutional rights.
>
> 2. Pretrial Disclosure of State's Theory
>
> It is well established that the State is not required to elect between legal theories in a murder prosecution prior to trial. Garcia, 358 N.C. at 389, 597 S.E.2d at 732; North Carolina v. Wingard, 317 N.C. 590, 594, 346 S.E.2d 638, 641 (1986). "Where the factual basis for the prosecution is sufficiently pleaded, a defendant must be prepared to defend against any and all legal theories which these facts may support." North Carolina v. Holden, 321 N.C. 125, 135, 362 S.E.2d 513, 522 (1987), cert. denied, 486 U.S. 1061, 108 S. Ct. 2835 (1988).
>
> Defendant also acknowledges that "as a matter of current state prosecution [is] proper," but again urges this Court to consider the matter anew. However, we are bound by the precedent set by the North Carolina Supreme Court.
>
> Defendant does not now challenge the sufficiency of the factual basis for the prosecution as set forth in the indictment. Thus, we conclude that the murder indictment set out sufficient factual information to enable Defendant to understand the basis of the State's case against him. Accordingly, the trial court did not err in denying Defendant's motion.

Wilson, 2010 WL 1753379 at \*\*6-\*7.

As the Fourth Circuit has found, "under North Carolina law, there is only one common law crime of murder, which by statute is divided into two degrees, . . . a short-form indictment that alleges the elements of common law murder is sufficient to satisfy the demands of the Sixth and Fourteenth Amendments." Stroud v. Polk, 466 F.3d 291, 295 (4th Cir. 2006) (citing Hartman v. Lee, 283 F.3d 190, 198-99 (4th Cir. 2002) and Allen v. Lee, 366 F.3d 319, 323-24 (4th Cir. 2004) (en banc). In holding that North Carolina's use of the short form indictment satisfies all constitutional parameters, the Fourth Circuit in Hartman held that the "[e]lementary principles of due process require that an accused be informed of the specific charge against him," 283 F.3d at 194 (citing Cole v. Arkansas, 333 U.S. 196, 201 (1948)), and that " '[a] person's right to

8

reasonable notice of a charge against him . . . [is] basic in our system of jurisprudence,' " id. (quoting In re Oliver, 333 U.S. 257, 273 (1948)). The Supreme Court has held that reasonable notice "sufficiently apprises the defendant of what he must be prepared to meet." Russell v. United States, 369 U.S. 749, 763 (1962) (internal quotation marks omitted) (evaluating indictment). In applying these standards to the use of the short-form indictment in North Carolina, the Fourth Circuit in Stroud found that "[i]t has long been 'fundamental in the law of criminal procedure . . . that the accused must be apprised . . . with reasonable certainty . . . of the nature of the accusation against him, to the end that he may prepare his defence"and that the Fourth Circuit "took great care in Hartman to stress that [the] holding [and use of the short-form indictment] did not undermine these fundamental principles." Stroud, 466 F.3d at 296 (internal citation omitted, citing United States v. Simmons, 96 U.S. 360, 362 (1878) (evaluating indictment))

Thus, as held in Cole, Oliver, Simmons, and Stroud, the Court of Appeal's ruling on the issue of the use of the short form indictment, disclosure of the State's theory of murder, and the resulting jury instructions on the theory, did not reach a result contrary to, or involve an unreasonable application of, clearly established federal law. Likewise, the state court's ruling was not based on an unreasonable determination of facts, in light of the evidence presented in the state-court proceeding. See 28 U.S.C. § 2254(d)-(e); Harrington, ___ U.S. at___ , 131 S. Ct. at 784-85; see also Cullen v. Pinholster, __ U.S. __, 131 S. Ct. 1388, 1389-99 (2011) ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). Thus, these claims fail.

ii. (Claim 3): the trial court's charge to the jury of the crime of first-degree murder by lying in wait was prohibited by the Double Jeopardy Clause of the Fifth Amendment, and the

court's failure to instruct the jury as to the existence of the "conclusive presumption" violated the Due Process Clause of the Fourteenth Amendment.

In turning to Claim 3, the claim regarding the court's charge to the jury the Court of Appeals found the following.

D. Instructions on Lying in Wait

By Defendant's last argument, he asserts that the trial court erred in its instructions on lying in wait by omitting the elements of malice and intent from the instruction. We disagree.

At trial, Defendant did not object to the challenged jury instruction. The State contends that the standard of review is, therefore, plain error. See North Carolina v. Odom, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983). Defendant argues, however, that the standard of review is de novo because the trial court had a statutory duty to instruct the jury on all elements of the crime pursuant to N.C. Gen.Stat. § 15A-1232. See North Carolina v. Ashe, 314 N.C. 28, 39, 331 S.E.2d 652, 659 (1985) (where the trial court neglects a statutory duty, the issue is preserved for appellate review as a matter of law). We need not determine which standard of review applies here, however, as we conclude that the trial court's instructions were not erroneous by any standard.

"First-degree murder has been historically defined in this State as the unlawful killing of a human being with malice and with premeditation and deliberation." North Carolina v. Johnson, 317 N.C. 193, 202, 344 S.E.2d 775, 781 (1986). "A murder perpetrated by means of lying in wait is murder in the first degree." North Carolina v. Leroux, 326 N.C. 368, 375, 390 S.E.2d 314, 320, cert. denied, 498 U.S. 871, 111 S.Ct. 192 (1990). "Premeditation and deliberation are not elements of the crime of first-degree murder perpetrated by means of lying in wait, nor is a specific intent to kill. The presence or absence of these elements is irrelevant." Id.; see Johnson, 317 N.C. at 203, 344 S.E.2d at 781 (when a homicide is perpetrated by means of poison, lying in wait, imprisonment, starving or torture, the presence or absence of premeditation, deliberation and specific intent to kill is irrelevant). This is because "when a homicide is perpetrated by means of poison, lying in wait, imprisonment, starving, or torture, the law conclusively presumes that the murder was committed with premeditation and deliberation." Johnson, 317 N.C. at 203, 344 S.E.2d at 781.

In this case, the trial court instructed the jury as follows:

You may find the Defendant guilty of first degree murder either on the basis of malice, premeditation and deliberation or on the basis of a murder committed by lying in wait or both. . . .

10

> First degree murder by [lying] in wait is the unlawful killing of a human being by placing oneself in a position to make a private attack upon a victim and by assailing the victim at a time when the victim is not aware of the purpose to kill them.
>
> . . . .
>
> I further charge that for you to find the Defendant guilty of first degree murder by lying in wait, the State must prove three things beyond a reasonable doubt.
>
> First, that the Defendant lay in wait for the victim. That is waiting [sic] and watched for the victim in ambush for a private attack on her.
>
> Second, that the Defendant intentionally assaulted the victim. Stabbing the victim with a knife would be an assault.
>
> And third, that the Defendant's act was a proximate cause of the victim's death . . . .
>
> These jury instructions track the North Carolina Pattern Jury Instruction 206.16 on murder by lying in wait and are consistent with North Carolina case law. Accordingly, the trial court did not err in its instruction on lying in wait. The assignment of error upon which this argument is based is overruled.
>
> Defendant received a fair trial, free of error.

Wilson, 2010 WL 1753379 at *7-*8.

To succeed on a claim arising from a jury instruction error, petitioner would have to show that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). Such fundamental unfairness did not occur in Wilson's trial. As explained after a detailed review of the instruction by the North Carolina Court of Appeals, the trial court's jury instructions "track the North Carolina Pattern Jury Instruction . . . on murder by lying in wait and are consistent with North Carolina case law. . . Defendant received a fair trial free of error." The Court of Appeal's ruling on the issue of the use of jury instructions did not reach a result contrary to, or involve an unreasonable application of, clearly established federal

law. Likewise, the state court's ruling was not based on an unreasonable determination of facts, in light of the evidence presented in the state-court proceeding.

iii. Claim 2: trial counsel failed to do legal research or have adequate knowledge, so as to challenge the constitutionality of the charge of first-degree murder by lying in wait, and was therefore ineffective

Claim 2 asserts a claim of ineffective assistance of trial counsel. In Strickland v. Washington, 466 U.S. 668, 687-90 (1984), the Supreme Court held that to prove ineffective assistance of counsel a petitioner must show counsel's performance was deficient and that the deficiency prejudiced his case. However, as throughly discussed above, it is well settled law within both the state and federal judiciary that the use of the short form indictment is constitutional and provides proper notice to defendant as to the charge of first-degree murder. Thus, no prejudice to petitioner can be asserted from the claim at issue. The claim is dismissed.

## CERTIFICATE OF APPEALABILITY

Having dismissed the petition, the court must now consider the appropriateness of the certificate of appealability. See Rule 11 of the Rules Governing Section 2254 Cases ("Habeas Rules") ("the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.") A certificate of appealability may issue only upon a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a petitioner's constitutional claims have been adjudicated and denied on the merits by the district court, the petitioner must demonstrate reasonable jurists could debate whether the issue should have been decided differently or show the issue is adequate to deserve encouragement to proceed further. Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

After reviewing the claims presented in the habeas petition in light of the applicable standard, the court finds reasonable jurists would not find the court's treatment of any of petitioner's claims debatable or wrong and none of the issue are adequate to deserve encouragement to proceed further. Accordingly, a certificate of appealability is DENIED.

## CONCLUSION

Accordingly, respondent's Motion for Summary Judgment [D.E. 14 and 15] is GRANTED, and the matter is DISMISSED. The certificate of appealability is DENIED. Having so determined, all other pending motions [D.E. 20] are DISMISSED as MOOT. The Clerk is DIRECTED to CLOSE the case.

SO ORDERED, this _13_ day of September 2012.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

13

Case 5:11-hc-02052-BO   Document 21   Filed 09/14/12   Page 13 of 13